**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 93-2411

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

DOUGLAS LEE BARLOW a/k/a
Douglas Lee Barlow, a/k/a
Henry Gibbons, and
WILLIAM HEBER LEBARON,
a/k/a Heber LeBaron, etc.,

Defendants-Appellants.

C/W

No. 93-2474

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PATRICIA LEBARON, a/k/a
Trish LeBaron, a/k/a
Valerie Davis,

Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of Texas

(December 20, 1994)

Before REYNALDO G. GARZA, WIENER, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

In this direct criminal appeal, we are called upon for the first time to interpret the reach of 18 U.S.C. § 247. In particular, we are asked to rule whether, as used in that statute, "the free exercise of religion" comprehends not only the right actively to select and practice the religion of one's choice, but also the right passively to refrain from practicing a particular religion or to disassociate one's self from one's former religion. We hold that the concept of "the free exercise of religion" is sufficiently broad to encompass both choices, active practice and passive disassociation.

Defendants-Appellants (collectively, Defendants), all members of a splinter religious sect commonly known as the "Church of the Lamb of God" (hereafter referred to variously as the "Church of the First Born of the Lamb of God," "Lamb of God," or simply "the Church," depending on the context when read), were convicted under 18 U.S.C. § 247 (obstruction of persons in the free exercise of religious beliefs), § 1962(c) (Racketeer Influence and Corrupt Organizations Act ("RICO")), § 371 (witness tampering), and § 924 (using a firearm in commission of violent crime), for conduct associated with the killing of four persons, three of whom were _former_ members of the Church. Leaders of the Church had ordered the execution of the three ex-members for the sole reason that they had chosen to disassociate themselves from the church's teachings and its fellowship. The fourth victim, an eight-year old daughter

2

of one of the adult victims, was killed because she witnessed the slaying of her father. Defendants challenge their convictions, raising a host of issues, including the scope of § 247, insufficiency of the evidence, invalid jury instructions, and inadmissibility of certain evidence. In addition, Defendant-Appellant Patricia LeBaron ("Patricia") asserts that the introduction into evidence of a statement that she made to a law enforcement official while she was incarcerated on other charges violated her constitutional rights. Finding no reversible error, we affirm the convictions and sentences of all Defendants in all respects.

I

FACTS AND PROCEEDINGS

Patricia and Defendant-Appellants Douglas Barlow ("Barlow") and William Heber LeBaron ("Heber"), were convicted on various charges stemming from the assassination-style killings of Mark Chynoweth ("Mark"), Edward Marston ("Ed"), Duane Chynoweth ("Duane"), and Duane's eight-year old daughter, Jenny Chynoweth ("Jenny"), which were carried out simultaneously on June 27, 1988.[1] At the time of the slayings, the Defendants were all members of the Church. The adult victims, all former members of the Church, were killed for the sole reason that they had chosen to disassociate

_____

[1]Aaron LeBaron ("Aaron") and Jacqueline Tarsa LeBaron ("Jacqueline"), also named in the instant indictment, are fugitives. Richard LeBaron ("Richard") pleaded guilty prior to trial. Cynthia LeBaron ("Cynthia") also was involved in the murders, but was given immunity in exchange for her testimony and has been placed in the witness protection program.

3

themselves and their families from the Church's teachings and membership.

A.    THE CHURCH OF THE LAMB OF GOD

In the early 1950s-60s, Joel LeBaron ("Joel") founded a religious sect which he named the "Church of the First Born of the Fullness of Time."  The religion practiced by Joel's organization was based on various distortions of early Mormon teachings and, according to Joel, "revelations from God."  Joel's brother, Ervil, was a member of Joel's church, but in 1971, the theological differences which had developed between the two brothers led Ervil to leave Joel's sect and form his own, which Ervil named the "Church of the First Born of the Lamb of God."  After that schism, Ervil and Joel engaged in a protracted power struggle to control the members and property of Joel's church; and in 1972, Ervil had Joel killed.  Ervil died in Utah State Prison in 1981, by which time various members of his sect))the Church))had been associated with nine murders in Mexico, California, and Utah.

The beliefs of the Church are set out in several publications, the most notable of whichSQthe Book of the New CovenantSQErvil wrote while incarcerated in Utah State Prison.  According to these teachings, the leader of the Church, known as the "Great Grand Patriarch" or "Patriarch," is empowered to brand disobedient members of the organization as "Sons or Daughters of Perdition," i.e., those who are "unredeemable."  Being marked unredeemable is tantamount to a death sentence, for the Church practices "blood atonement," an archaic religious doctrine which is purported to

4

teach that unredeemable members of a religion can obtain eternal salvation only through the shedding of their own blood.

Once the Patriarch pronounces a punishment, other members of the Church are required to carry it out. The reward for carrying out the Patriarch's directives is to share in the leadership in the Kingdom of God; those who fail to do so, however, themselves become children of perdition.

B.    THE ORDER TO KILL ED, MARK, AND DUANE

While Ervil was still in prison, Mark left Utah for Texas and then relocated in California, during which time, according to Ervil, Mark was living in "rebellion."[2] Mark had begun to question some of Ervil's teachings, which led Ervil to pronounce:

> There is a great controversy being caused by my servants Mark Chynoweth . . . with the support of Ed Marston, and it is my will, that if these . . . men will not repent immediately, that they should be destroyed immediately; because they are advantageous, and are seeking to destroy my little children, even the little children of my great and beloved Prophet, Seer, and Revelator . . . . [I]f they will not repent . . . I now declare them to be outlaws, and I will require any man who loves me, and who will have a crown at my right hand, to kill them upon sight . . . .[3]

Apparently neither Ed nor Mark "repented," so Ervil continued to proclaim that the two were Sons of Perdition, to be killed on sight. At some point, Ervil's wrath turned to Duane, prompting Ervil to decree that Ed could "be forgiven, only if he now shall kill king cobra [Duane] and Mark Chynoweth."[4] After Ed, Mark, and

---

[2]Book of the New Covenant § 85, at 136.

[3]Id. § 102, at 159.

[4]Id. § 342, at 402; see id. § 369, at 423.

5

Duane learned of Ervil's various pronouncements,[5] in particular the one ordering Ed to kill Duane and Mark, these three decided to reject the teachings of both Ervil and the Church in toto.

Ervil's successor, Aaron, also denounced Ed, Mark, and Duane as "Sons of Perdition" because the three had chosen to disassociate themselves from the Church. Although at various times Church members openly discussed carrying out the Patriarchs' death sentences, Ervil's dictates remained unfulfilled until 1988. At that time, however, Aaron commanded that Ervil's prior edicts be enforced, and he ordered members to execute Ed, Mark, and Duane.

C.   THE KILLING OF ED, MARK, DUANE, AND JENNY

In May 1988, Heber masterminded an elaborate scheme to carry out Ervil's and Aaron's directives. Heber planned to have the three Sons of Perdition slain simultaneously; no small feat given that Ed lived in Dallas, and Mark and Duane in Houston. The plan included surveillance, disguises, communication equipment, and stolen vehicles. Four Church members were assigned the task of killing the three former members: Heber would kill Mark; Patricia and Richard would kill Duane; and Barlow would kill Ed. Other Church members, such as Natacia LeBaron ("Natacia") and Cynthia would assist. Heber had anticipated that one or more of the targeted former members might be accompanied, so he instructed the assassins to kill all witnesses "over four years old."

Ed, Mark, and Duane were all in the appliance repair business, each with his own company. Ed's and Duane's standard operating

_____

[5]See id. § 85, at 136.

procedures were to go personally to their clients' homes to pick up appliances that needed servicing. Knowing this, Heber planned to telephone Ed and Duane and arrange for each intended victim to go to a different vacant house ostensibly to pick up an appliance needing repair. At each such location, a Church member would be waiting to kill the victim upon his arrival. In contrast, Mark had his employees pick up his clients' appliances, so Heber elected personally to kill Mark inside his own store.

Heber's plan was set in motion on the morning of June 27, 1988. Equipped with binoculars, Cynthia and Natacia parked in front of Mark's place of business in Houston. When they saw Mark arrive, they radioed Heber who was waiting by a telephone. Heber, who was in Houston, then called Duane (also in Houston) and Ed (in Dallas). Heber arranged for each of them to pick up an appliance at a different vacant house at the same time later that same day.

At that appointed time, Heber positioned himself outside Mark's business in Houston, made sure that Mark was there, then radioed Cynthia (who was waiting in a car nearby) to "go for it." Heber, dressed in a business suit, then walked into Mark's store and shot him as he sat at his desk.

After receiving Heber's signal to "go for it," Cynthia called Barlow (who was waiting at a pay telephone in Dallas) and told him to execute the plan. Barlow proceeded to the vacant house in Dallas where Ed was scheduled to pick up an appliance, waited for Ed to arrive, and shot him when he did. A person who lived across the street from that vacant house saw the assailant, whom she later

7

described as a young male in a "business-looking outfit."

Meanwhile, Patricia and Richard were in a black Silverado truck ("Silverado"), cruising around the Houston neighborhood in which was located the vacant house where Duane was to pick up an appliance. When Patricia and Richard spotted Duane's pickup truck in the driveway of that vacant house, they parked behind his truck. Richard then walked up to the cab of the truck and shot Duane several times. Observing that Jenny was in the cab of Duane's truck, Richard shot her too, in compliance with Heber's instructions. A person who lived directly across the street heard a gunshot, turned toward the sound, and saw Richard firing into Duane's truck. That person described the killer as "well dressed in a business suit and tie," later confirming that the shooter's vehicle was similar to the Silverado pictured in one of the government's photographic exhibits.

After committing the four homicides, the perpetrators dismantled their firearms and disposed of them. The four active participants then reunited in Fort Worth, where they discussed the killings among themselves.

D.   THE APPREHENSION, ARREST, AND PROSECUTION OF THE DEFENDANTS

On July 1, 1988 (four days after killing Ed, Mark, Jenny, and Duane), Heber, Patricia, and Barlow were arrested in Phoenix, Arizona at the King's Inn Motel ("Motel") and charged with automobile theft. A Phoenix officer had noticed the Silverado parked at the Motel and discovered that the number on its license plate matched the number of the license of a truck reported as

stolen in Texas.[6]  The police checked with the clerk at the Motel to determine if anyone with Texas identification had registered at the Motel and learned that a "Christina Adams" (later identified as Cynthia) had registered for rooms 151 and 153 using a Texas driver's license.  The police ran a check of that license and determined that it had not been issued to a Christina Adams.

The police watched rooms 151 and 153 and the stolen Silverado for the remainder of the day, developing information that constituted probable cause to arrest several of the Defendants, including Richard and Patricia, as suspects in the theft of the Silverado.  The police subsequently arrested the Defendants in room 150 of the Motel after chasing Patricia, who by then was already one of the suspects in the automobile theft, to the vicinity of room 150.  Observing suspicious activity in that room, the police knocked on the door to ascertain whether Patricia had hidden there to avoid capture.  Remaining outside the threshold of the room when the occupants opened the door to room 150, the police first observed Richard, whom the police previously had linked to the stolen Silverado.  As Richard was a suspect in the automobile theft, the police thought that they also might find Patricia))who had just evaded apprehension and who also was linked to the stolen vehicle))in the same room as Richard.  The police therefore entered room 150 without a warrant to look for Patricia, a fleeing suspected felon, whereupon they saw her emerge from the restroom.

---

[6]The police later discovered that the Silverado was stolen from Euless, Texas, and that its plates were stolen from another truck near Dallas, Texas.

9

After some preliminary questioning of the Defendants by the police and a brief search of the rooms and automobiles in which the Defendants had been observed by the police at various times, the Defendants were arrested and transported to the police station to be charged with automobile theft. When the police tried to question Patricia, she requested a lawyer.

The next morning, the police executed search warrants on rooms 150, 151, and 153 from which several items of physical evidence were obtained, including: three duplicate copies of the June 29, 1988 edition of the Dallas Times Herald in which the June 27, 1988 killings of Ed, Mark, Duane, and Jenny were reported; silicone sealant (similar to that used in the stolen Silverado); disguises; a list of scanner radio frequencies for the Dallas/Ft. Worth area; a listing of specific radio monitor frequencies for the Houston Police Department; a cache of weapons, including a holstered TARS .38 special revolver loaded with five rounds of ammunition; additional ammunition; speed loaders; shoulder holsters; gun pouches; and a cleaning kit for a rifle.

Later that same morning, Patricia, Cynthia, and Jacqueline were released from custody. Five days later, while still unaware of any connection between the persons that they arrested at the Motel and the homicides in Texas, the police released Heber and Barlow from custody.

It was not until almost a week after the release of Heber and Barlow that the police connected the suspects in the Arizona automobile theft with the Houston homicides. That occurred when a

10

Houston homicide detective called the Phoenix police department asking if they knew whether a "Mary June Whitt" had been seen in the area. The Houston detective explained that Ms. Whitt was a suspect in some homicides in Houston and that the Houston police had reason to believe that she might then be in Phoenix.

One of the Phoenix detectives happened to recall the name "Mary June Whitt" from an automobile theft investigation that he had conducted the previous December. He remembered that two women, "Pamela Monique Newman" and "Mary June Whitt," had been arrested in a stolen vehicle in Colorado and were subsequently extradited to Phoenix for prosecution. He had noticed that "Valerie Davis," one of the women arrested at the Motel, resembled Pamela Monique Newman. In a comparison of their fingerprints, the police confirmed that "Pamela Monique Newman" was in fact "Valerie Davis," one of Patricia's aliases.

Shortly thereafter the Defendants were charged by sealed federal indictment with nine counts, including murder for hire,[7] witness tampering,[8] and illegal use of a firearm in a violent crime.[9] The indictment was unsealed about a week later, a short while after which the Defendants were transferred to federal custody. They appeared before a magistrate judge in connection

---

[7] 18 U.S.C. § 371, see id. §§ 2, 1952(A) (aiding and abetting murder for hire).

[8] Id. § 1962(c); see id. § 1962(d) (conspiracy to witness tamper).

[9] Id. § 924(c); see id. § 2 (aiding and abetting use and carrying of a firearm).

with the instant offenses, and a few days later the magistrate judge denied pretrial release for all Defendants.

Approximately one month later a superseding indictment issued, charging all Defendants with fourteen counts. This indictment added counts charging obstruction of free exercise of religion[10] and RICO violations.[11]

A joint suppression hearing was held several weeks later, during which all evidence proffered by the government was determined to be admissible, with the exception of some spiral notebooks that had been obtained without a warrant from room 150 at the time the Defendants were arrested at the Motel. In addition, the district court found admissible an oral confession made by Patricia to Houston Homicide Detective John Burmester (the scene investigator for the murders of Duane and Jenny) at Arizona's Perryville State Prison ("Perryville"). At the time of their interview, Patricia was incarcerated at Perryville serving a nine-year sentence for automobile theft as a result of her arrest at the Motel.

The Defendants were tried before a district court jury early in January 1993. During that trial, Cynthia testified for the prosecution in exchange for the government's grant of immunity. At the close of the government's case, the Defendants made a motion for judgments of acquittal, which the trial court denied. The

---

[10]Id. § 247; see id. § 371 (conspiracy to obstruct); id. § 2 (aiding and abetting obstruction).

[11]Id. § 1962(c).

12

Defendants reurged their motion at the close of all of the evidence. Ultimately, the jury returned guilty verdicts against all Defendants on all counts except Count 7 (aiding and abetting Patricia in her use and carrying of a firearm). The court then granted Defendants' motion for judgment of acquittal on the murder for hire counts (Counts 1-4), concluding that the Defendants obtained no pecuniary remuneration in consideration for the killings. Each Defendant was sentenced to, inter alia, two 5-year terms, two 20-year terms, and four life-terms, all to run concurrently, plus five years supervised release. This appeal followed.

II

ANALYSIS

Although we have carefully considered all assignments of error advanced by Defendants, we discuss in detail only those we deem especially significant. We address those seriatim.

A.    INTERPRETATION OF 18 U.S.C. § 247

The Defendants argue that they were wrongly convicted for violating 18 U.S.C. § 247, which makes criminal the obstruction of persons in the free exercise of their religious beliefs. The Defendants contend that § 247 is inapposite to their conduct, because (1) the Church is not a religion, and (2) even if it were, the Defendants did not obstruct the victims' "free exercise of religion" as contemplated by the drafters of that statute.

1.    The Church as a "Religion"

According to the Defendants, killing Ed, Mark, and Duane

13

because they left the Church could in no way be considered an obstruction of the victims' free exercise of religion. This contention is grounded in the assertion that the Church is not a religion.

It cannot seriously be disputed that the Church constitutes a religion for purposes of the Free Exercise Clause,[12] from which the redactors lifted the precise language now found in § 247. The record is replete with evidence demonstrating that the Church is a religion: It is an organization with a 30-year history of religious teaching, an established following, recorded laws, and religious philosophies, theologies and doctrines based on what it claims are "revelations from God." The mere fact that the beliefs of the Church may have derived from a perverse distortion of early Mormon beliefs or that it is a creed not practiced by multitudes does not prevent it from being classified as a "religion" for the purpose of determining whether it is entitled to protection under the Free Exercise Clause. The Supreme Court recently reaffirmed that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."[13] As the Church is a religion within the contemplation of the First Amendment, it is a religion for purposes of § 247.

---

[12]U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .").

[13]Church of the Lukumi Babalu Aye v. City of Hialeah, 113 S. Ct. 2217, 2225 (1993) (quoting Thomas v. Review Bd. of Ind. Employment Security Div., 450 U.S. 707, 714 (1981)).

14

2.    The Free Exercise of Religion

The Defendants further complain that the jury was improperly instructed that, as used in § 247, "the free exercise of religion" means, inter alia, "the victims' voluntary choice to discontinue their membership in The Lamb of God,"[14] thereby requiring that the government prove only that the Defendants killed their victims because they voluntarily chose to leave the Church.  This was error, claim the Defendants, as such evidence alone is insufficient to obtain a conviction under § 247.

In an effort to bolster their argument, Defendants point to a portion of the legislative history of the Act that provides:

> Conviction under [§ 247], requires the prosecutor to show that the defendant intentionally attempted or did obstruct another from engaging in activities pursuant to that individual's religious beliefs and that he or she knew that the person was engaging in the activities pursuant to religious beliefs.[15]

Relying on this language, the Defendants contend that the prosecution was required to adduce evidence that the Defendants actually knew the current religious beliefs of the victims and killed them to prevent their engaging in activities pursuant to those beliefs.  As the evidence is uncontroverted that the Defendants did not know the victims' current religious preferences or practices, conclude the Defendants, they could not be found

---

[14]The court also described free exercise as encompassing (1) "an individual's ability to freely and voluntarily choose what religious tenets to believe or not believe," or (2) "an individual's ability to act lawfully in conformity with his or her religious beliefs."

[15]S. REP. NO. 324, 100th Cong., 2d Sess. 1 (1988), reprinted in 1988 U.S.C.C.A.N. 721, 724.

guilty of an offense under § 247.  To the extent that there may be doubt concerning the reach of that section, Defendants beseech us to resolve that uncertainty in their favor by applying the rule of lenity.[16]

At bottom, we are asked to determine whether § 247 encompasses the acts for which these Defendants were convicted; namely, the intentional killing of three individuals solely because they decided to discontinue their association with and practice of a particular religion and acted upon this decision by estranging themselves from membership in that organization and ceasing to observe and fulfill the tenets of their formerly espoused religion. As this is an issue of statutory interpretation, our review is de novo.[17]

In interpreting § 247, it is our task to give effect to the intent of the Congress that enacted that statute.  "To divine that intent, we traditionally look first to the words of the statute . . . ."[18]  If the language of § 247 is clear and unambiguous, then our interpretative journey comes to an end, and we apply that plain

---

[16]See United States v. Kozminski, 487 U.S. 931, 952 (1988).

[17]United States v. Long, 996 F.2d 731, 732 (5th Cir. 1993).

[18]United Steelworkers of Am. v. Weber, 443 U.S. 193, 253 (1979) (Rehnquist, J., dissenting); see Mackey v. Lanier Collections Agency & Serv., Inc., 486 U.S. 825, 840 (1988) ("[W]e must look at the language of [the statute] and its structure, to determine the intent of the Congress . . . ."); American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) ("As in all cases involving statutory construction, `our starting point must be the language employed by Congress,' and we assume `that the legislative purpose is expressed by the ordinary meaning of the words used.'" (quotations omitted)).

16

meaning to the facts before us to determine if the Defendants' conduct was punishable under that section.[19]  Only if we find the text of § 247 to be opaque or translucent, or even merely ambiguous, must we attempt to divine congressional intent by applying prescribed canons of statutory interpretation (including, without limitation, a resort to the rule of lenity[20] and legislative history[21]).

Section 247 provides:

Whoever . . . intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so; shall . . . . if death results, [be punished by] a fine . . . and imprisonment for any term of years or for life, or both . . . .[22]

The government established at trial that the Defendants killed Ed, Mark, and Duane because those three decided to estrange themselves

---

[19]Connecticut Nat'l Bank v. Germain, 112 S. Ct. 1146, 1149 (1992) ("When the words of a statute are unambiguous, then . . . `judicial inquiry is complete.'"); see American Tobacco Co., 456 U.S. at 68 ("Thus `[a]bsent a clearly expressed legislative intention to the contrary, the language must ordinarily be regarded as conclusive.'"  (quotation omitted)).

[20]NOW, Inc. v. Scheidler, 114 S. Ct. 798, 806 (1994) ("[T]he rule of lenity applies only when an ambiguity is present . . . ."); see United States v. Knox, 32 F.3d 733, 751 n.15 (3d Cir. 1994) ("[T]he application of the rule of lenity is not dependent whatsoever on whether there have been successful prosecutions under the statute at issue."); petition for cert. filed, 63 U.S.L.W. 3181 (U.S. Sept. 7, 1994) (No. 94-413).

[21]See Toibb v. Radloff, 501 U.S. 157, 162 (1991) ("`Where . . . the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.'") (quoting Blum v. Stenson, 465 U.S. 886, 896 (1984))).

[22]18 U.S.C.A. § 247(a)(2), (c)(2) (West 1994).

17

from the beliefs of and membership in the Church and carried out that decision. This fact finding is not strenuously contested on appeal; neither could it be seriously questioned, as it is supported by overwhelming evidence in the record. To determine whether the Defendants' conduct is punishable under § 247, therefore, we must answer the extremely narrow question, "is the decision, and subsequent implementation of the decision, to disassociate oneself from the beliefs of and membership in a particular religious faith a manifestation of `the enjoyment of the free exercise of religion?'" As we are convinced that it is, we conclude that the Defendants were properly convicted of violating § 247.

The concept of "the free exercise of religion" is indeed a frequent flyer in American jurisprudence. It was incorporated into the First Amendment; and in the ensuing 200 years the courts of our land have developed an entire body of "free exercise" jurisprudence which has delineated many of the metes and bounds of the conduct embodied in that notion. When Congress enacts laws, it is presumed to be aware of all pertinent judgments rendered by our branch.[23]

---

[23]Evans v. United States, 112 S. Ct. 1881, 1885 (1992) ("`Where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the "cluster of ideas attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."'" (quotations omitted)); Lorillard v. Pons, 434 U.S. 575, 583 (1978) ("`[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary.'" (quotation omitted)).

So when Congress enacted § 247, it must have intended for "the free exercise of religion" as used in that section to encompass the entire panoply of activities which the judicial branch has previously ascribed to that notion.

The Supreme Court has recognized that one such aspect of "the free exercise of religion" includes the negative as well as the positive:  It is the right of an individual to practice the religion of his choice <u>or to be free from the practice of religion altogether</u>.[24]  The "set" of the right to be free from <u>all</u> religion logically includes the "sub-set" of the right to be free from <u>a particular</u> religion))such as the teachings of and affiliation with the Church in the instant case.  Ed, Mark, and Duane were killed for the sole reason that they attempted to disassociate themselves from a particular religion, <u>i.e.</u>, the Church.  It follows inescapably that by intentionally killing Ed, Mark, and Duane solely because they made this purely religious choice, the Defendants intentionally obstructed by force the three victims' enjoyment of their free exercise of religious beliefs))the right freely to choose <u>not</u> to associate with the Church, <u>not</u> to believe in its tenets, and <u>not</u> to join in fellowship with its members.  Thus Defendants' actions in assassinating their former co-religionists fall squarely within the ambit of § 247.

When viewed through the lens of traditional free exercise

---

[24]<u>Wallace v. Jaffree</u>, 472 U.S. 38, 53-54 (1985) ("[T]he court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or <u>none at all</u>." (emphasis added)).

jurisprudence, the plain language of § 247 manifests Congress' specific intent to make criminal, inter alia, the conduct at issue here: the killing of Ed, Mark, and Duane for the sole reason that they chose to exercise their right to extricate themselves from the beliefs, practices, and fellowship of the Church. As the plain language of § 247 compels the conclusion that the conviction of these Defendants under that section was proper, we need not reach the Defendants' contention that the legislative history compels a different interpretation. We find comfort in that fact, however, thatSQcontrary to Defendants' contentionSQthe history of the Act when read in its entirety completely supports the result that we reach today.[25]

---

[25]First, as the legislative history recommended, the government did prove that Defendants intentionally obstructed Ed, Mark, and Duane from engaging in activities pursuant to their religious beliefs and that Defendants knew that the victims were engaging in those activities pursuant to religious beliefs. See S. REP. No. 324, 100th Cong., 2d Sess. 1 (1988), reprinted in 1988 U.S.C.C.A.N. 721, 724. In this case, however, the "religious activity" was the victims' decision to leave the Church and all of its teachings and practices. The Defendants intentionally killed Ed, Mark, and Duane because the Defendants knew that the victims had left the flock of the Lamb of God, no longer believed in the tenets of that faith, and were engaging in activities (estrangement from the Church) pursuant to those religious beliefs.

Second, Defendants engaged in the very ill that § 247 was enacted to cure. In its report, the Senate Judiciary Committee cited as the catalyst for this legislation the "growing number of incidents of religiously motivated violence." Id. at 722. The evidence in the record conclusively establishes that the slayings of Ed, Mark, and Duane were religiously motivated. Although the Senate Report cited recent studies reporting increased violence against certain religious organizations perpetrated by particular so-called "hate-groups," we do not consider it significant that Congress failed to identify the Church by name, or for that matter failed to identify by name the countless other such small sects and cults that might promote violence against persons who

20

B.   OTHER ERRORS ASSIGNED

The Defendants challenge several other aspects of their multiple convictions, including, inter alia, the sufficiency of the evidence, several of the district court's instructions to the jury, and the admission at trial of various items of evidence.  After thoroughly reviewing the record and carefully considering the briefs and oral arguments of able counsel, we are firmly convinced that, although the arguments presented are not frivolous, they present no reversible error.  In fact, only one such contention merits further attention))albeit brief.

Patricia argues that her oral confession, given to Burmester while she was confined in Perryville, was not made voluntarily and that the introduction of the substance of that statement into evidence violated her constitutional rights.  We are not convinced.

The record makes clear that Burmester went to Perryville to discuss the 1988 homicides with Patricia, and that he sought to establish a congenial, supportive rapport with Patricia to encourage her to speak freely with him.[26]  But after carefully

---

freely exercise their right to choose to practice another religion))or, as here, to discontinue worshiping with those sects or cults.  The convictions of Defendants for violating § 247 were entirely proper, as they are entirely consistent with the text, purpose, and even the legislative history of that law.

[26]There is nothing inherently wrong with an officer attempting to create a favorable climate for confession by attempting to strike an emotional chord with a defendant, and that is all that Burmester did here.  See, e.g., United States v. Rojas-Martinez, 968 F.2d 415, 418 (5th Cir.) ("Expressions of sympathy by an officer are not [impermissibly] coercive."), cert. denied, 113 S. Ct. 828 (1992); Hawkins v. Lynaugh, 844 F.2d 1132, 1140 (5th Cir.) (interviewer's efforts to invoke emotional response, standing alone, not offensive to due process), cert.

scrutinizing the totality of the circumstances relevant to Patricia's confession,[27] we do not believe that Patricia was subjected to such psychological coercion that her will was overborne, rendering her statement involuntary. On this point, we find particularly probative Patricia's own words in a message to her brother, taped privately immediately after she spoke with Burmester. In that conversation she is heard to confide that she had confessed "of my own free will, and nobody forced me to do it." Like the trial judge and the jury before us, we believe her. In the end, we must ascertain whether the means used to obtain the confession were "compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means [or] whether [this] defendant's will was in fact overborne."[28] We cannot conclude that the means used to convince Patricia to talk to Burmester were incompatible with our system or that Patricia's will was in fact overborne; rather, we conclude that her statement

denied, 488 U.S. 490 (1988); Bryant v. Vose, 785 F.2d 364, 368 (1st Cir.) (confession voluntary even if motivated by police chief's observations that triggered emotional response of sorrow and remorse in suspect), cert. denied, 477 U.S. 907 (1986).

Maybe, as she herself testified, Patricia confessed because she felt "hopeless" and "disillusioned" when faced with the repercussions of her actions; but a defendant's confession is not involuntary merely because it was made once the defendant finally confronted the dire consequences that flowed from her previous criminal conduct.

[27]Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (listing factors relevant to a determination of voluntariness).

[28]Miller v. Fenton, 474 U.S. 104, 116 (1985).

22

was voluntarily made.[29]

Neither were Patricia's constitutional rights violated by the introduction of her confession into evidence against her.[30] The record makes clear that Patricia voluntarily and intelligently waived her privilege against self incrimination and her right to counsel.[31]

Neither has Patricia proved a violation of the rule established in Edwards v. Arizona,[32] which forbids a law enforcement official's reinitiating discussions with a suspect after that suspect has invoked the right to counsel. Patricia had twice previously requested counsel: once while being detained in Chicago in 1989 on alien smuggling charges,[33] and again on July 1, 1988 when she was arrested at the Motel for automobile theft. But in this

---

[29]For many of the same reasons, we agree with the district court that Patricia's confession also was voluntary as required by 18 U.S.C. § 3501.

[30]Patricia was interrogated by Burmester while she was in custody and after the indictment naming her as a defendant in the instant offenses had issued; Patricia therefore had both a Fifth and Sixth Amendment right to counsel. Michigan v. Jackson, 475 U.S. 625, 629-30 (1986); United States v. Cruz, 22 F.3d 96, 98 n.7 (5th Cir.) (per curiam), cert. denied, 115 S. Ct. 207 (1994).

[31]We note that Patricia confessed only after she was advised of her rights, read those rights aloud, responded that she understood those rights, and then signed an advice of rights card in the presence of two witnesses, on which card she acknowledged that she understood her rights and waived them voluntarily.

[32]451 U.S. 477 (1981). Patricia did not allege an Edwards violation below, thus our review on appeal is limited to plain error. United States v. Olano, 113 S. Ct. 1770, 1776 (1993).

[33]Patricia was charged in Illinois federal court with possession of false documents, in violation of 18 U.S.C. § 1028(a)(4), and then released.

23

case, neither of these two previous invocations are sufficient to form the basis of an Edwards claim.

Patricia was not indicted for the federal offenses at issue here until August 1992, so her requests for legal assistance prior to that date can be relied upon to argue only that her Fifth Amendment right to counsel was violated.[34] Although Burmester did reinitiate contact with Patricia after she requested counsel in 1988 and 1989, the record is clear that Patricia had been released from custody following each of those previous confinements. Other circuits have held that if, after invoking her Fifth Amendment right to counsel, a suspect is released from custody, then the concerns that prompted Edwards' prophylactic rule are sufficiently minimized that any Edwards violation allegedly founded on those prior requests simply "dissolves."[35] We find the logic embodied in these decisions to be persuasive and embrace it today.[36] The

---

[34]"The Sixth Amendment [right to counsel] is offense-specific," McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); see United States v. Fairman, 813 F.2d 117, 121 (7th Cir.), cert. denied, 483 U.S. 1010 (1987), and vests only when one becomes "the accused," Escobedo v. Illinois, 378 U.S. 478, 485 (1964); United States v. Gouveia, 467 U.S. 180, 188 (1984).

[35]Dunkins v. Thigpen, 854 F.2d 394, 397 (11th Cir. 1988) ("a break in custody dissolves a defendant's Edwards claim"), cert. denied, 489 U.S. 1059 (1989); United States v. Hines, 963 F.2d 255, 257 (9th Cir. 1992) ("Edwards rule does not apply to suspects who are not in continuous custody between the time they request counsel and the time they are reinterviewed"); see, e.g., Fairman, 813 F.2d at 125; United States v. Skinner, 667 F.2d 1306, 1309 (9th Cir. 1982), cert. denied, 463 U.S. 1229 (1983); cf. McFadden v. Garraghty, 820 F.2d 654, 661 (4th Cir. 1987) (citing with approval Skinner's proposition that there can be no Edwards violation if defendant is not in continuous custody).

[36]Patricia also claims that she repeatedly requested counsel during her August 27, 1992 discussion with Burmester, but before

24

district court did not err in ruling that Patricia's oral confession was admissible.

Again, finding no reversible error, the convictions and sentences of all Defendants are, in all respects, AFFIRMED.

---

she confessed.  In the suppression hearing, however, the district court found otherwise.  That court found more believable the testimony of Burmester, another officer, and a tape recording of those discussions))all of which support the conclusion that no such requests were made.  The record does not reflect that this factual finding was clearly erroneous.