# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1512

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Arkansas |
| | * | |
| Eric Daniel Harris, | * | [PUBLISHED] |
| | * | |
| Appellant. | * | |

_____

Submitted:  June 13, 2000

Filed:  August 3, 2000

_____

Before BOWMAN, MORRIS SHEPPARD ARNOLD, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Eric Harris confessed to burning the church where he worked as a pastor.  Prior to trial, Harris moved to suppress that confession.  After the district court[1] denied his pretrial motion, Harris pleaded guilty.  On appeal, Harris contends that law enforcement officers violated the constitutional principle enunciated in Edwards v. Arizona, 451 U.S. 477 (1981), by interrogating him after he had requested the assistance of counsel. We disagree, and therefore affirm.

_____

[1]The Honorable Susan Webber Wright, Chief Judge, United States District Court for the Eastern District of Arkansas.

# FACTUAL BACKGROUND

Harris pastored the Kentucky Missionary Baptist Church in Benton, Arkansas. Over time, the church congregation divided into factions regarding an issue of church discipline. Harris sought to contrive a project that the members of the congregation could work on together, thereby promoting unity of purpose.

On Saturday, August 24, 1996, Harris visited the church in the evening to turn on the air conditioning in preparation for the next morning's service. Hoping to "provide [the] church with a project to heal the division," Harris set fire to one of the walls of the church. Harris lit paper towels with a match and placed the flaming towels underneath an air conditioning outlet. He then left the church and returned home to watch a televised football game. Approximately one half-hour later, the church became engulfed in flames. Harris returned to assist passersby in fighting the blaze, but the church building burned down. Harris later claimed that he had intended only to scorch a small area of the church wall that could then have been repaired by members of his congregation.

Federal, state, and local law enforcement officials interviewed Harris about the church fire over the course of the next few years. But Harris did not admit that he had started the fire. Harris subsequently moved to Oklahoma. On February 3, 1999, FBI Special Agent Chester Lucas contacted Harris about taking a polygraph examination. Harris volunteered to take the exam the next day at the local Stephens County Sheriff's Office. On February 4, Agent Lucas — accompanied by an FBI polygrapher, Special Agent Phillip Gadd — met Harris at the sheriff's office at 1:30 PM. Harris read and executed both a Consent to Interview with Polygraph Form and a <u>Miranda</u> waiver-of-rights form. Agents Lucas and Gadd specifically informed Harris that he was not in custody and could leave at any time.

Harris flunked the polygraph exam. Following the exam, Agent Gadd questioned Harris further about several inconsistencies in his story. Agent Gadd interrogated Harris for roughly 1½ to 2 hours following the administration of the polygraph examination. Agent Lucas was absent from the room during the polygraphing and most of the questioning that followed, but he returned to participate in the questioning of Harris. Agent Gadd eventually left to visit the restroom; Harris then told Agent Lucas, "I have something for you, but not today. I want to see a lawyer." Harris then left the sheriff's office and returned home.

Agents Lucas and Gadd left the sheriff's office and drove back to their base in Oklahoma City. During the ride, they discussed whether to reinitiate contact with Harris in view of his statement that he wanted a lawyer. After consulting with agents in a divisional FBI office, Agents Lucas and Gadd decided that Harris had not been "in custody," and that they were free to contact Harris again.

Agent Lucas called Harris at home that same evening, approximately three hours after the post-polygraph interrogation ceased. Agent Lucas expressed interest in learning the "something" that Harris "had for them." After a brief conversation, Harris agreed to meet the agents for another interview the following day at the sheriff's office.

The next day, February 5, 1999, Harris met Agents Lucas and Gadd at the sheriff's office at 11:00 AM. Harris did not bring a lawyer. The Agents did not read Harris the Miranda warnings. Shortly after the interview began, Harris confessed to burning down his church in Benton. Harris then reduced his confession to writing.

# PROCEDURAL HISTORY

On March 3, 1999, a grand jury in the Eastern District of Arkansas indicted Harris with violating 18 U.S.C. § 844(i), the federal arson statute,[2] by burning the church in Benton. Prior to trial, Harris moved to suppress his confession on two grounds.

First, Harris contended that he was in custody on February 4. He claimed that by asserting his right to a lawyer at the close of the February 4 interrogation, he insulated himself from the second interrogation on February 5. See Edwards, 451 U.S. at 484-85 (holding that an accused who had "expressed his desire to deal with the police only through counsel[] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police"). Harris argued that his confession — taken at the second interview — was obtained in violation of Edwards and ought to be suppressed at trial.

---

[2]Last Term, the Supreme Court was asked to review the constitutionality of § 844(i) as applied to private homes. See Jones v. United States, 120 S. Ct. 1904, 1908-1909 (2000) ("Whether, in light of United States v. Lopez, 514 U.S. 549 (1995), and the interpretive rule that constitutionally doubtful constructions should be avoided, see Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U.S. 568, 575 (1988), 18 U.S.C. § 844(i) applies to the arson of a private residence; and if so, whether its application to the private residence in the present case is constitutional."). But the Court avoided the constitutional question by determining that private homes did not fall within the ambit of § 844(i). See Jones, 120 S. Ct. at 1909 (holding "that § 844(i) does not reach an owner-occupied residence that is not used for any commercial purpose"). Neither Harris nor the government questioned the constitutionality of § 844(i) as applied to *churches*. We therefore decline to pursue the constitutional argument further since the Court has not cast aspersions upon the constitutional application of § 844(i) to places of worship. Cf. Russell v. United States, 471 U.S. 858, 860-61, 860 n.6 (1985) (recognizing that Congress intended to apply § 844(i) "to the bombings of churches, synagogues, or religious edifices").

Second, Harris contended that even if he had *not* been in custody during the February 4 interrogation, the Agents' act of reading the Miranda warnings vested in him the right to a lawyer provided by those warnings. When he later asserted that right at the close of the first day's interrogation, Harris argued, Edwards protected him from interrogation on the second day.

A magistrate judge held an evidentiary hearing and issued findings and conclusions. The judge rejected both of Harris's arguments and recommended to the district court that the suppression motion be denied. The district court affirmed the magistrate judge's recommendation in a written opinion. Once the district court ruled that Harris's confession would not be suppressed, Harris pleaded guilty. The district court accepted the plea and sentenced Harris on February 11, 2000. Harris reserved the right to appeal the suppression decision, and he timely filed an appeal challenging the district court's denial of his motion to suppress.

**DISCUSSION**

We review for clear error a district court's findings of fact made in connection with a defendant's pretrial motion to suppress evidence and statements. See United States v. Brown, 156 F.3d 813, 815 (8th Cir. 1998). Whether, as a matter of law, a defendant was deprived of his rights under the Fifth Amendment is a mixed question of fact and law that we review de novo. See id.

Harris concedes for purposes of this appeal that he was not in custody during the February 4 interrogation. But Harris contends that he should be *treated* as if he were in custody because the FBI agents read him the Miranda rights.[3] Harris argues that the

_____

[3]We refer to this argument as the "transformation" argument. Harris argues that the Agents' reading of the Miranda rights *transformed* an otherwise noncustodial interrogation into a custodial interrogation, one in which a suspect deserves Miranda's protections.

government must honor the rights he was read, even if he was not otherwise entitled to those rights. In contrast, the government objects that the reading of the <u>Miranda</u> warnings to Harris was superfluous, since Harris was not in custody, and was not entitled to <u>Miranda</u>'s protections in any event.

We have not addressed the transformation argument in any of our prior cases. We note that several circuits and state supreme courts have discussed the transformation argument with varied results. Some courts have held that the reading of the <u>Miranda</u> rights during a non-custodial interrogation does *not* afford the suspect any of those rights, since the reading is unnecessary. <u>See, e.g.</u>, <u>Davis v. Allsbrooks</u>, 778 F.2d 168, 172 (4th Cir. 1985); <u>United States v. Charles</u>, 738 F.2d 686, 693 n.6 (5th Cir. 1984); <u>United States v. Kampiles</u>, 609 F.2d 1233, 1242 (7th Cir. 1979); <u>United States v. Lewis</u>, 556 F.2d 446, 449 (6th Cir. 1977); <u>State v. Haddock</u>, 897 P.2d 152, 162-63 (Kan. 1995). Other courts have suggested that the reading of the <u>Miranda</u> rights *does* transform a non-custodial interrogation into a custodial interrogation. <u>See</u> <u>United States v. Bautista</u>, 145 F.3d 1140, 1151 (10th Cir.), <u>cert. denied</u>, 525 U.S. 911 (1998); <u>Tukes v. Dugger</u>, 911 F.2d 508, 516 n.11 (11th Cir. 1990). Finally, a third category of cases adopts a middle ground, permitting the trial court to consider the reading of the <u>Miranda</u> rights as one factor among many used to determine whether a suspect's statements are voluntary. <u>See</u> <u>Sprosty v. Buchler</u>, 79 F.3d 635, 642 (7th Cir. 1996); <u>State v. Taillon</u>, 470 N.W.2d 226, 229 (N.D. 1991).

Although we are disinclined to adopt the transformation argument as an extension of our <u>Miranda</u> jurisprudence, we need not decide that issue in this appeal. Even if Harris had been entitled to <u>Miranda</u>'s protections, the break between his request for a lawyer on February 4 and his confession on February 5 defeats the protection Harris seeks under <u>Edwards</u>.

A suspect who invokes the <u>Miranda</u> right to counsel may not be reapproached by police unless counsel is made available. <u>See</u> <u>Edwards</u>, 451 U.S. at 484-85.

Edwards' prophylactic rule prevents law enforcement officials from badgering suspects who request the services of an attorney. See id. at 485. But Edwards protection is not without boundaries. The Supreme Court has suggested, in dictum, that a break in custody defeats Edwards protection. See McNeil v. Wisconsin, 501 U.S. 171, 177 (1991) ("If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary . . . .").

At least six circuits have adopted a rule consistent with this dictum. See McFadden v. Garraghty, 820 F.2d 654, 660-61 (4th Cir. 1987); United States v. Barlow, 41 F.3d 935, 945-46 (5th Cir. 1994); United States ex rel. Espinoza v. Fairman, 813 F.2d 117, 125 (7th Cir. 1994), overruled on other grounds, United States v. LaGrone, 43 F.3d 332 (7th Cir. 1994); United States v. Skinner, 667 F.2d 1306, 1309 (9th Cir. 1982); United States v. Geittmann, 733 F.2d 1419, 1425 (10th Cir. 1984); Dunkins v. Thigpen, 854 F.2d 394, 397 (11th Cir. 1988). These courts expressly limit Edwards protection to those suspects who remain in *continuous* custody from the time they request counsel to the time they are interrogated again.

The seminal case was Skinner. In Skinner, a defendant went to the police station for an interview voluntarily, but left after expressing a desire to speak with an attorney. The next morning, Skinner was arrested and signed a Miranda waiver before confessing. The Ninth Circuit refused to bar Skinner's reinterrogation under Edwards because of the break between his invocation of the Miranda right to counsel and his subsequent voluntary confession. The court distinguished the facts in Edwards:

> Edwards was under arrest and in custody continuously from the time he requested an attorney through the next day when the guard told him "he had to" talk and officers interrogated him again. Skinner, however, was not in continuous custody. Skinner went to the police station voluntarily on July 10. He was free to leave the station after questioning, and did leave after he said he wanted to talk to a lawyer before answering more

-7-

questions. When Skinner left the station that afternoon, he had the opportunity to contact a lawyer or to seek advice from friends and family if he chose to do so.

Skinner, 667 F.2d at 1309; see also United States v. Hines, 963 F.2d 255, 257 (9th Cir. 1992) ("[A] 'Skinner break' is sufficient to defeat application of the Edwards rule against reinterrogation.").

Although we have not explicitly adopted the Skinner limitation on Edwards, we recently indicated our amenability to limit Edwards in a fashion that surpasses Skinner's limitation. See Holman v. Kemna, 212 F.3d 413, 419 (8th Cir. 2000) ("Other circuits have noted that various factors such as a break in custody or a lapse in time may vitiate the coercive effect of an impermissible interrogation so that the admission of subsequent statements is not barred by the Edwards rule. We do not believe these circumstances to be exhaustive and think that other scenarios may also militate against the finding of an Edwards violation.") (citations omitted). In Holman, we effectively agreed to go *beyond* Skinner, finding that Edwards protection might be unavailable even to some suspects who *had* remained in continuous custody. See Holman, 212 F.3d at 419.

"Edwards thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990). Concern that a suspect will be "badgered" is greatest when a suspect remains in confinement from the time he requests a lawyer until the time that police attempt to reinterrogate him. That concern is not present in cases such as this, however, where a person is not in continuous custody and the coercive effects of confinement dissolve. See Barlow, 41 F.3d at 945-46. Finding the limitation in Skinner well founded, we adopt the rule as our own.

Harris was not in continuous custody between the time he requested a lawyer on February 4 and the time he was reinterrogated and later confessed on February 5. The result would not be different if we viewed Agent Lucas's phone call to Harris's home on the evening of February 4 as the reinitiation of interrogation. That phone call took place at least three hours after Harris left the interview room in the local sheriff's office. In light of the circumstances of this case, we conclude that a three-hour break in time defeats Edwards protection, since Harris had ample opportunity to consult his family, friends, or a lawyer. See Dunkins v. Thigpen, 854 F.2d at 397 (noting that a defendant needs only "a reasonable opportunity to contact his attorney"). Indeed, Harris admitted that he desired only an opportunity to pray and consult with his wife. Since Harris did not remain in custody, but was permitted to return home, Edwards does not bar introduction of his subsequent confession.

We affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.