Opinion for the court filed by Circuit Judge GARLAND.
Dissenting opinion filed by Circuit Judge ROGERS.
GARLAND, Circuit Judge:
Defendant Rocky Lee Brown submitted a conditional guilty plea to the charge of unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Police found guns and ammunition in a parked car in which Brown was sitting. The defendant now appeals from the district court’s denial of his motion to suppress that evidence, contending that the police twice violated his Fourth Amendment rights: first, by opening the car’s door; and second, by searching its trunk. We reject Brown’s arguments and affirm the judgment of the district court.
I
At approximately 1:45 a.m. on April 14, 2001, Officers Joshua Branson and Michael Bryant of the Metropolitan Police Department arrived at an apartment building in Washington, D.C., in response to a citizen’s call to the police. The citizen, Sharron Peterson, had reported that there had been a fight in the adjacent parking lot, that shots had been fired, and that a bullet had shattered the window of her child’s bedroom while the child was sleeping. The officers knew the neighborhood to be the site of “a lot of drug activity” as well as “several shootings and several homicides” that year. Suppression Hr’g Tr., App. at 42.
When the officers arrived at Peterson’s building, she pointed out a white Cadillac that was sitting in the parking lot. She told the officers that after hearing the gunshots, her sister — who, unlike Peterson herself, had been in the apartment at the time — opened the blinds and saw the men in the car looking up at her. The officers went to the parking lot, which was partially illuminated by street lights, and asked the two men inside the white car to step outside. They then questioned the men for about half an hour.
While the officers were talking to the occupants of the white Cadillac, they noticed a black Cadillac, which was the only other occupied car in the lot, parked fifteen to twenty feet away. Officer Bryant watched as a man got out of the driver’s seat of the black car. The man ap *1163 proached the officers and then stopped for a while, leaning on a fence and “observing [the officers], like it’s a game going on.” Id. at 54. Thereafter, he retreated toward the black car, continued watching for some time, and finally walked away down an alley, never to return. Officer Branson later testified that he regarded the man’s behavior as “peculiar,” id. at 39, noting that he “seemed to be eyeing out my partner and myself,” id. at 41, and “sizing us up,” id. at 44. Officer Bryant also observed another occupant of the black Cadillac, subsequently identified as defendant Brown, get out of the car and then get back inside. Id. at 66.
After they finished questioning the men in the white car, the officers decided to approach the black car and question its occupants because, the officers believed, they might either have “been involved with” or “observed” the earlier events in the parking lot. Id. at 57. Bryant approached with a lit flashlight. Although his vision of the interior of the car was obscured by the car’s darkly tinted windows, Officer Branson could see “images of people.” Id. at 41. As Branson approached the car, he saw “two people, one of [whom] got up from the rear seat and jumped over into the front seat.” Id. Branson testified that this made him “even more suspicious” and “very cautious.” Id.
Upon reaching the car, Officer Branson knocked on the rear passenger-side window, where he could see that one of the two occupants was sitting. When there was no response, Branson “cracked the door open” because he “wanted to make sure that [he and his] partner were safe.” Id. at 43-44. Immediately upon opening the door, Branson observed a pistol on the floor of the back seat next to Brown’s foot. Brown’s hand was “right there ... like it was tickling the handle.” Id. Branson immediately pulled Brown out of the car and handcuffed him. The other occupant, a female, was taken from the front passenger seat and handcuffed as well.
After searching the passenger compartment of the car, Officer Branson removed the keys from the ignition. He then opened the car’s locked trunk. There, Branson found a shotgun bag containing an AR-15 semi-automatic rifle, along with several magazines filled with ammunition.
Brown was charged by a grand jury with one count of unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of unlawful possession of a semi-automatic assault weapon, in violation of 18 U.S.C. § 922(v)(l). He filed a motion to suppress the evidence found in the car as the fruit of an unlawful search and seizure. Following an evidentiary hearing, the district court denied the motion. Brown then entered a conditional guilty plea to the first count of the indictment, reserving his right to appeal the suppression ruling. See Fed.R.Crim.P. 11(a)(2). The government dropped the second count after concluding that the AR-15 did not meet the statutory definition of an assault weapon. The defendant now appeals the denial of his motion to suppress.
II
Brown contends that Officer Branson violated the Fourth Amendment’s prohibition of unreasonable searches and seizures when he opened the car door, thereby rendering the subsequent seizure of the pistol unlawful. He further contends that, even if the opening of the door was legitimate, the police acted unconstitutionally when they searched the car’s trunk and seized the rifle and ammunition they found inside. Accordingly, he argues that both guns, as well as the ammunition, should have been excluded from use as evidence at trial.
*1164 In response, the government maintains that the opening of the door was lawful under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which permits officers to undertake an investigatory stop if they have a reasonable suspicion of criminal activity, and to conduct a protective search for weapons if they have a reasonable fear for their safety. The government further argues that the search of the trunk was lawful under United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), because discovery of the pistol in the passenger compartment provided probable cause to believe that there were additional weapons, ammunition, and/or other contraband in the trunk.
We decide de novo whether the police had reasonable suspicion, reasonable fear, and probable cause. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); United States v. Christian, 187 F.3d 663, 666 (D.C.Cir.1999). However, we review the district court’s “findings of historical fact only for clear error,” and give “due weight to inferences drawn from those facts” and to the court’s determinations of witness credibility. Ornelas, 517 U.S. at 699-700, 116 S.Ct. at 1663-64; see Christian, 187 F.3d at 666. Our analysis of the police conduct in question is objective: “[t]he principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.” Ornelas, 517 U.S. at 696, 116 S.Ct. at 1661-62; see Terry, 392 U.S. at 21-22, 88 S.Ct. at 1879-81.
In Parts II.A and II.B, we consider the lawfulness of the door-opening and the trunk search, respectively.
A
In Terry v. Ohio, the Supreme Court held that a police officer needs neither probable cause nor a warrant to conduct a brief investigatory stop of an individual if he has a reasonable suspicion that “criminal activity may be afoot.” 392 U.S. at 30, 88 S.Ct. at 1884; see United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002); United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The Court also held that, during such a stop, an officer may conduct a protective search of the outer layers of the suspect’s clothing if he has a “reasonable fear” that the suspect is armed and dangerous. Terry, 392 U.S. at 30, 88 S.Ct. at 1884; see Michigan v. Long, 463 U.S. 1032, 1034, 103 S.Ct. 3469, 3473, 77 L.Ed.2d 1201 (1983). In order to justify such a stop and/or search, the officer must be “able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion.” Terry, 392 U.S. at 21, 88 S.Ct. at 1880. In Michigan v. Long, the Court extended the scope of a Terry search beyond the person of the suspect to the area “within his immediate control,” including the passenger compartment of an automobile. 463 U.S. at 1049, 103 S.Ct. at 3480-81; see Christian, 187 F.3d at 668.
The parties appear to assume that the opening of the car door constituted both a stop and a search for Terry purposes, and we do so as well. Because the stop and the search were thus coincident, both the reasonable suspicion and reasonable fear elements of the Terry standard must be satisfied. See Christian, 187 F.3d at 668. In assessing those issues, we examine the totality of the circumstances, not any one factor individually. As we explained in United States v. Edmonds:
*1165 An officer on the beat does not encounter discrete, hermetically sealed facts. Rather, as we repeatedly have cautioned, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them.... Hence, even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors — especially when viewed through the eyes of an experienced officer — may.
240 F.3d 55, 59-60 (D.C.Cir.2001) (citations omitted); see also Arvizu, 534 U.S. at 273, 122 S.Ct. at 750-51; Terry, 392 U.S. at 22-23, 88 S.Ct. at 1880-81.
In this case, several circumstances support the reasonableness both of the officers’ suspicion of criminal activity and of them fear of danger. The first circumstance is the fact that the incident took place in a neighborhood known for “a lot of drug activity” and in which, earlier that same year, there had been “several homicides” and “numerous calls for gunshots.” Suppression Hr’g Tr., App. at 42; see also Appellant’s Br. at 28 (describing the location as a “high crime neighborhood”). Although we agree with our dissenting colleague that an individual’s presence in such an area, “standing alone, is not enough to support reasonable, particularized suspicion that the person is committing a crime,” Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000), it is nonetheless true that “the fact that the stop occurred in a ‘high crime area’ [is] among the relevant contextual considerations in a Terry analysis,” id. See Edmonds, 240 F.3d at 60 (“[T]he probative value of a neighborhood’s reputation as a high-crime area is firmly established.”); United States v. Johnson, 212 F.3d 1313, 1316 (D.C.Cir.2000). The importance of this factor is further compounded by the lateness of the hour. See Long, 463 U.S. at 1050, 103 S.Ct. at 3481 (listing the fact that “the hour was late” as one circumstance justifying officers’ “reasonable belief that [the defendant] posed a danger”); United States v. Roggeman, 279 F.3d 573, 578-79 (8th Cir.2002) (same); United States v. Moore, 235 F.3d 700, 704 (1st Cir.2000) (same); United States v. Ramires, 307 F.3d 713, 716 (8th Cir.2002) (listing the fact that “it was late at night” as one circumstance justifying a Terry stop).
The second relevant factor is the event that brought the officers to the parking lot in which Brown’s car was parked: a report that gunshots had been fired from the lot into the window of a child’s bedroom. That fact enhanced the probability that criminal activity had been committed, or was being committed, by someone inside one of the only two occupied cars in the lot. See United States v. Raino, 980 F.2d 1148, 1150 (8th Cir.1992) (holding that a Terry stop was supported by the fact that “the officers were responding to a late-night call that shots had been fired in precisely the area appellant’s car was parked”). It also strengthened the grounds for the officers’ fear that the occupants of the car might be armed and dangerous. Cf. id. (holding that, where shots had been fired nearby, a police officer “acted reasonably in using extreme caution” as he approached a vehicle, since, if the officer’s suspicion that the shots came from the vehicle proved correct, its occupant “would certainly be armed”).
Brown raises several objections to our consideration of this factor. He argues that, because of the amount of time that had passed since the shots had been fired,[1] it was unreasonable to connect the *1166 shots to the occupants of the black car. Although we agree that the passage of time lessened the shots’ significance, it did not eliminate it entirely; it was certainly plausible that the person or persons who fired the gunshots might not have departed the area. Brown also objects on the basis of Sharron Peterson’s testimony that the black car did not arrive in the lot until after the police began questioning the men in the white car, suggesting that the former was not there when the shots were fired. But the district court credited Officer Branson’s statement that the police did not see the black car arrive, and thus that “either the car was present when [the officers] started to talk to the people in the white Cadillac or they did not see the black limousine come onto the parking lot and they made a reasonable assumption that it had been there at the point that they got to the parking lot.” Suppression Hr’g Tr., App. at 165. We find no error in this analysis.[2]
Brown also objects to the relevance of the gunshots on the ground that, when Peterson talked with the officers, she pointed out the white car rather than the black. But neither Peterson nor her sister had actually seen the gun being fired, and indeed, Peterson herself had not even been home at the time of the gunshots. Peterson told the police only that her sister had opened the blinds and seen people looking up at her from the white car after she heard the shots. Id. at 89-90. Thus, what the police knew was not inconsistent with the possibility that the shots had been fired from the black car. And once the police finished questioning the men in the white car, it was hardly unreasonable for them to turn their suspicions to the only other people in the lot.
Finally, both Brown and the dissent object that there was no evidence that the officers approached the black car because they believed that its occupants were participants in the gunfire rather than innocent bystanders or mere witnesses. This objection is wrong as a matter of fact and irrelevant as a matter of law. In context, it is clear that Officer Branson’s testimony that he approached the black car “as if ... doing a traffic stop,” id. at 42, referred to his tactics and not to any assumption that the occupants were merely guilty of a “traffic violation,” Dissenting Op. at 1164. Branson testified that he was suspicious, and further testified that the officers approached the car because they believed its occupants might have either “observed” or “been involved” in the altercation. Suppression Hr’g Tr., App. at 41, 57. The officers were not required to resolve the occupants’ status before stopping them, see Wardlow, 528 U.S. at 126, 120 S.Ct. at 677, and in any event, the officers’ actual motives do not bear on our objective assessment of reasonable suspicion. See Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) *1167 (“[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.” (internal quotation marks omitted)); Christian, 187 F.3d at 670 (holding that an officer’s “actual motives for conducting [a] search [are] not relevant as long as his actions [are] objectively reasonable”).
A third circumstance supporting the officers’ reasonable suspicion and fear was the activity of the man who got out of the black car, watched the officers for a while, and then disappeared down the alley. While a general curiosity about police activity would be insufficient to raise suspicion or concern, there was more than that here. Officer Branson described the behavior as “peculiar,” and testified that the man “seemed to be eyeing out my partner and myself’ and “sizing us up.” Suppression Hr’g Tr., App. at 41, 44. See Arvizu, 534 U.S. at 275-76, 122 S.Ct. at 751-52 (citing relevant factors including the defendant’s stiffened posture and his children’s “methodical, mechanical, abnormal” waving to police, “certainly ... a fact that is odd” (quotation marks omitted)); Terry, 392 U.S. at 23, 88 S.Ct. at 1881 (citing the fact that men repeatedly walked back and forth between a street corner and store window); United States v. Bravo, 295 F.3d 1002, 1008 (9th Cir.2002) (citing the defendant’s “overly-friendly” demeanor toward a U.S. Customs inspector); United States v. Mancillas, 183 F.3d 682, 686, 697 (7th Cir.1999) (citing the fact that, when an officer arrived, three occupants exited a car and walked away in different directions).[3]
Brown objects that the officers could not have been particularly concerned about this man since they did not follow him down the alley to question him. But reasonable officers could well have decided to focus their attention on the remaining occupants of the cars, rather than to take off after the pedestrian or to divide their forces. As “appellate judges we do not second-guess a street officer’s assessment about the order in which he should secure potential threats” or investigate his suspicions. Christian, 187 F.3d at 669. Moreover, the subjective concerns of these particular officers are, once again, irrelevant to the legal analysis. See Horton v. California, 496 U.S. 128, 137-38, 110 S.Ct. 2301, 2308-09, 110 L.Ed.2d 112 (1990); Terry, 392 U.S. at 21-22, 88 S.Ct. at 1879-81.[4]
A fourth factor is the behavior of the remaining two passengers in the black car, one of whom “got up from the rear seat and jumped over into the front seat” as the officers approached. Suppression Hr’g Tr., App. at 41. It .is well settled that an individual’s furtive movements may be grounds for reasonable suspicion and fear, justifying a Terry stop and search. See Wardlow, 528 U.S. at 124, 120 S.Ct. at 676 (recognizing that “nervous, evasive behavior is a pertinent factor in determining *1168 reasonable suspicion”); Edmonds, 240 F.3d at 61; Christian, 187 F.3d at 668; United States v. Green, 465 F.2d 620, 623 (D.C.Cir.1972). It is true that “furtive gestures ‘are significant only if they were undertaken .in response to police presence,’ [a]nd a suspect can respond to the presence of a police officer only if he has recognized him as an officer.” Edmonds, 240 F.3d at 61 (quoting Johnson, 212 F.3d at 1316). But there was more than a sufficient basis for the officers to believe that they had been recognized: they were in uniform; their patrol car was marked; one of the passengers (later identified as Brown) had previously gotten out of the black car while the officers were questioning the men from the white car not far away; and Officer Bryant carried a lit flashlight as he approached the black car.
It is of course possible that it was merely a coincidence that the passenger jumped from the back seat to the front at the very moment the officers came near. But the possibility of such a coincidence does not negate the officers’ reasonable suspicion and fear, nor does the fact that the passenger’s behavior did not necessarily indicate criminal activity or prospective danger.[5] As the Supreme Court has made clear, that an individual’s conduct is “ambiguous and susceptible of an innocent explanation” does not mean that it may not be grounds for suspicion: “Terry recognized that ... officers could detain [such] individuals to resolve the ambiguity.” Wardlow, 528 U.S. at 125-26, 120 S.Ct. at 677; see also Arvizu, 534 U.S. at 277, 122 S.Ct. at 753 (holding that a “determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct”).
We cannot agree with the dissent’s suggestion that characterizing the passenger’s behavior as “furtive” in this circumstance is equivalent to holding that “any reaction to seeing the police is indicative of criminal complicity.” Dissenting Op. at 1164. Jumping over a car seat as an officer approaches is not just “any reaction.” Moreover, although we again note the Supreme Court’s instruction that the officers’ subjective reactions to this behavior are not relevant to the analysis, see, e.g., Horton, 496 U.S. at 137-38, 110 S.Ct. at 2308-09, we disagree that there was no testimony that the officers considered “that conduct, or other conduct by the occupants, to be aberrations ... that reinforced their suspicion.” Dissenting Op. at 1164. In fact, Officer Branson testified that the passenger’s jump from the back seat made him “even more suspicious.” Suppression Hr’g Tr., App. at 40.
In addition to these four circumstances, each of which supports both the officers’ suspicion of criminal activity and their fear of physical harm, two other factors dramatically increased the risk that the encounter posed to the officers, and hence provide additional grounds justifying that fear.[6] First, the Terry stop that the officers were about to undertake involved not a pedestrian but the occupants of an automobile. As the Supreme Court noted in Long, “investigative detentions involving suspects in vehicles are especially fraught with danger to police officers.” 463 U.S. at 1047, 103 S.Ct. at 3480; see also Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 *1169 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (noting the “inordinate risk confronting an officer as he approaches a person seated in an automobile”). Recent cases make clear that this danger continues to be significant. See Maryland v. Wilson, 519 U.S. 408, 413, 117 S.Ct. 882, 885-86, 137 L.Ed.2d 41 (1997); United States v. Holt, 264 F.3d 1215, 1222-23 (10th Cir.2001) (citing 1999 statistics).
Second, the windows of the black Cadillac were darkly tinted, preventing the officers from having a clear view of the car’s occupants. This fact magnified the danger of approaching unknown individuals inside an automobile, because the tinting made it impossible to know whether one of the occupants was reaching for a weapon — as it appears Brown was doing — or otherwise acting to endanger the officers’ safety. As the Fourth Circuit said in United States v. Stanfield:
When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of uneonscionability. Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer’s view by darkly tinted windows. [The officer] has no way of knowing whether the vehicle’s driver is ... reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants.
109 F.3d 976, 981 (4th Cir.1997) (emphasis omitted).
In sum, the officers who stopped Brown and searched the car in which he was sitting were faced with the following circumstances: Late at night, in an area known for crime and gunfire, and in a parking lot where shots had been fired that very night, they came upon two occupied parked cars. While they were questioning men in one of the cars, an individual got out of the other and “sized them up” and “eyed them out” before disappearing down an alley. Thereafter, as the officers approached the second car to question its remaining occupants, one of the rear passengers jumped over a seat into the front. Any other activity by the occupants, as well as their position and that of any weapons they might possess, was obscured by tinted glass. We conclude that, based on the totality of these circumstances, reasonable officers could both suspect the possibility of illegal activity and be concerned for their safety.[7] And because our decision is based on all of these circumstances, we do not suggest that “whenever the police approach a car in the course of investigating a shooting late at night, ... the police may intrude on the personal security of the occupant of a car based on a person’s mere presence in a high-crime neighborhood.” Dissenting Op. at 1166.
Faced with these circumstances, Officer Branson undertook a stop and search of the most minimal kind: he merely cracked open the car door and looked inside without breaking the plane of the car’s surface. Cf. Wilson, 519 U.S. at 415, 117 S.Ct. at 886-87 (holding that the “additional intrusion” imposed on passengers by ordering them out of a car during a traffic stop “is minimal”); Mimms, 434 U.S. at 111, 98 S.Ct. at 333-34 (same regarding drivers); Stanfield, 109 F.3d at 982-83 (holding that *1170 the privacy intrusion effected by police opening a car door is “considerably less” than that approved by the Supreme Court in Mimms). Moreover, the stop “lasted a mere matter of moments ... before the discovery of the gun [in plain view] ripened what had been merely reasonable suspicion into the full-scale probable cause necessary for an arrest.” United States v. Hensley, 469 U.S. 221, 236, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985) (Brennan, J., concurring). Thus, because “the officer’s action was justified at its inception, and ... was reasonably related in scope to the circumstances which justified” it, Terry, 392 U.S. at 19-20, 88 S.Ct. at 1879, the stop and the search were valid.
Brown does not contest that, if the opening of the door was lawful, Officer Branson was entitled to seize the gun that was in plain view. See Long, 463 U.S. at 1050, 103 S.Ct. at 3481. Accordingly, because we conclude that the opening of the door was lawful, the seizure was as well, and the district court did not err in denying the motion to suppress the gun. See Edmonds, 240 F.3d at 62-63.
B
After arresting Brown and seizing the pistol found in the passenger compartment of the black Cadillac, Officer Branson proceeded to open the car’s trunk. There, he discovered and seized an AR-15 semi-automatic rifle and several magazines filled with ammunition. Brown contends that the trunk search violated the Fourth Amendment, and that the evidence it yielded must be suppressed for that reason.
The government does not suggest that the opening of the trunk was justified as a Terry search, as such searches are limited to areas immediately accessible to the suspect — in this case, to the passenger compartment of the car. See Long, 463 U.S. at 1048-49, 103 S.Ct. at 3481-81; Christian, 187 F.3d at 668. Rather, the government argues that, after finding a gun on the floor of the passenger compartment, Branson had probable cause to search the trunk to see whether more guns, ammunition, and/or other contraband were stored there. In Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court upheld the validity of a warrantless automobile search based on probable cause to believe that the vehicle contained contraband. In United States v. Ross, the Court held that the “scope of a warrantless search of an automobile ... is defined by the object of the search and the places in which there is probable cause to believe that it may be found.” 456 U.S. 798, 824, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982). “If probable cause justifies the search of a lawfully stopped vehicle,” the Court said, “it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.” Id. at 824-25, 102 S.Ct. at 2173. The question before us, therefore, is whether the police had probable cause to believe that contraband might be found in the trunk of the black Cadillac or, as we put it in United States v. Turner, “whether the trunk was one of several parts of the vehicle that ‘might contain the object of the search.’ ” 119 F.3d 18, 20 (D.C.Cir.1997) (quoting Ross, 456 U.S. at 821, 102 S.Ct. at 2170-71).
In Turner, we applied Ross in upholding the search of a car’s trunk. The search in Turner followed a traffic stop, during which the police officer had noticed three pieces of evidence: a strong smell of marijuana emanating from the car; pieces of torn cigar tobacco in the defendant’s lap, which the officer testified were consistent with the use of a hollowed-out cigar “blunt” to smoke marijuana; and a ziplock bag containing a “green, weed-like material” that the officer believed to be marijuana. Id. at 18-19. We concluded that this evidence was sufficient to meet the re *1171 quirements of probable cause: that is, “ ‘a fair probability that contraband or evidence of a crime’ ” would be found in the trunk. Id. at 20 (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). In so holding, we rejected Turner’s argument that the evidence indicated nothing more than personal use of marijuana and that a person who uses rather than distributes drugs would keep them within his immediate control rather than in a luggage compartment. Id. at 20-21. While we agreed that “it may be true that evidence of narcotics distribution would constitute even stronger cause to believe additional contraband had been secreted in the trunk,” we found the evidence sufficient “to establish a ‘fair probability’ that Turner might have hidden additional drugs not necessary for his current consumption in areas out of plain sight, including the trunk of the car.” Id. at 20.
We reach a similar conclusion here for several reasons. First, the presence of a gun supported the possibility that the car contained ammunition, additional weapons, and/or other contraband. As we have held in the context of Terry searches and in that of searches incident to arrest, “the presence of one weapon may justifiably arouse concern that there may be more in the vicinity.” Christian, 187 F.3d at 669; see United States v. Abdul-Saboor, 85 F.3d 664, 670 (D.C.Cir.1996) (“[H]aving already uncovered a loaded handgun, a loaded semi-automatic pistol, and a magazine, the arresting officers could well anticipate that other weapons were stowed throughout the apartment....”). Moreover, the presence of the- gun suggested that drugs may have been in the vicinity as well. Cf. United States v. Conyers, 118 F.3d 755, 757 (D.C.Cir.1997) (noting the connection between guns and drugs); United States v. Dunn, 846 F.2d 761, 764 (D.C.Cir.1988) (describing a revolver as “a tool of the narcotics trade” and holding that the defendant’s “connection to the gun suggested] he exercised control over the drugs in the house”). Second, multiple gunshots had reportedly been fired that night from the lot in which the black car was parked. This fact increased the likelihood that multiple guns were present, as did the fact that there had been at least three people in the car that night. Finally, the fact that Brown’s hand was “drooping down” and “tickling the handle” of the gun as Officer Branson opened the door, Suppression Hr’g Tr., App. at 44, suggested that Brown may have been using the gun to protect other contraband. It was reasonable to infer that the trunk was a likely hiding place.
We do not perceive any material difference between this case and Turner. If anything, possession of a firearm under these circumstances provides a stronger basis for a trunk search than does evidence of personal use of marijuana. The dissent suggests that one difference is that in Turner, the government offered testimony concerning a missing trunk key found in the defendant’s shoes. Dissenting Op. at 1168. But in Turner we expressly declined to consider the significance of that testimony because there was a dispute over whether the key had been lawfully seized. Turner, 119 F.3d at 20 n. 2. We “instead limit[ed] ourselves to considering only the three pieces of evidence” that we have described above. Id.
Brown suggests a different distinction, noting that in Turner we said that the police officer’s “testimony, based on his experience in narcotics and traffic enforcement, supports” the conclusion that there was probable cause to search the trunk, Turner, 119 F.3d at 20 (emphasis added), and further notes that in this case Officer Branson did not specifically testify about the trunk search. But Turner did not hold that such testimony is a necessary element of a probable cause determination, and we *1172 do not think such testimony was required here. The presence of the gun, along with the other factors identified in the previous paragraph, was sufficient to establish probable cause.[8]
Finding little to distinguish Brown’s case from Turner’s, we are left with Brown’s argument that Turner was wrongly decided. Turner, of course, is the law of the circuit and may not be overturned by a subsequent panel. See, e.g., National Mining Ass'n v. Fowler, 324 F.3d 752, 760 (D.C.Cir.2003). But even if that were not the case, we would not overturn it, since we find Brown’s argument unpersuasive.
The defendant’s principal attack on Turner is his contention that this court misread Robbins v. California, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981). Turner cited Robbins — a case in which marijuana and equipment for using it were found in a car’s passenger compartment — because the Supreme Court stated in dic-turn that the subsequent search of the car’s luggage compartment was lawful. Relying on facts recited in the California appellate court decision that the Robbins Court reviewed, People v. Robbins, 103 Cal.App.3d 34, 38, 162 Cal.Rptr. 780 (Cal.Ct.App.1980), Brown claims that the validity of the search was based not on the marijuana but on an incriminating statement made by the defendant. But as we have recently said in rejecting a similar argument in another case, “one can examine the Supreme Court’s opinion with a microscope without learning that fact.” Rancho Viejo v. Norton, 323 F.3d 1062, 1072 (D.C.Cir.2003). The Robbins Court did not mention the incriminating statement, and we find the defendant’s resort to the judicial equivalent of legislative history unconvincing.[9]
In any event, whether supportive or not, there is certainly nothing in Robbins that is. contrary to the holding of Turner.[10] *1173 Moreover, Robbins was only one of several decisions upon which Turner relied, and it remains true today — as it was then — that our resolution of the lawfulness of the trunk search in Turner is consistent with that of every other circuit that has considered a similar question.[11] As the cases cited in note 11 suggest, although probable cause determinations are fact-specific and depend on the totality of the circumstances, the discovery of contraband in the passenger compartment of a car is a factor that strongly supports the lawfulness of a trunk search. In this case, we conclude that the totality of the circumstances provided probable cause to search the black Cadillac for guns, ammunition, and/or narcotics, and that the trunk was a part of the vehicle that “might contain the object of the search.” Turner, 119 F.3d at 20 (quoting Ross, 456 U.S. at 821, 102 S.Ct. at 2171).
Ill
We hold that Officer Branson did not violate the Fourth Amendment, either when he opened the door to the car in which appellant Brown was sitting or when he subsequently opened and searched the car’s trunk. The district court’s denial of Brown’s motion to suppress is therefore

Affirmed.

. The district court found that Peterson called the police department sometime between 10 and 12 p.m., and that the officers arrived around 1:45 a.m.

. Although reasonable suspicion is an objective standard, it is nonetheless evaluated on the basis of "the totality of the circumstances as the officer on the scene experienced them." Edmonds, 240 F.3d at 59 (emphasis added). For the same reason, this court cannot take into account many of the facts recounted in the dissenting opinion, as they were not known to the investigating officers at the time of the search. For example, although complainant Peterson subsequently testified that she was familiar with the black car, that it was often parked in the lot behind her aparlment, that it was not in the parking lot at the time of the shooting, and that the white car had twice left the parking lot before returning, she did not tell the officers any of those facts. To the contrary, she said nothing whatsoever about the black car to the officers. Suppression Hr'g Tr., App. at 64, 92. Similarly, although Brown later told another officer that the other person in the car was his girlfriend, Officers Branson and Bryant did not know that at the time they searched the car and trunk. Id. at 80.

. Although the dissent correctly observes that the government conceded at oral argument that the officers would not have had reasonable suspicion based on this man’s behavior alone, the government was also careful to state that his behavior was nonetheless one of several factors that in combination generated the necessary level of suspicion. We may not reject the relevance of a factor simply because viewed "in isolation” from the others it is insufficient. Arvizu, 534 U.S. at 274, 122 S.Ct. at 751. As the Supreme Court only recently reminded us, “Terry ... precludes this sort of divide-and-conquer analysis.” Id.

. For the same reasons, we reject Brown’s contention that, because the officers spent so much time talking with the men in the white car, there must not have been anything suspicious about the black car or its occupants.

. Brown’s brief intimates that all that was involved was amorous activity that the couple did not wish the police to observe.

. We agree with our dissenting colleague that neither of these two factors "excuse[s] Terry’s requirement that the police possess adequate suspicion to conduct a stop in the first place.” Dissenting Op. at 1166-1167. It is the preceding four factors that justify the stop; the last two merely provide additional support for the reasonable fear that justifies the search.

. Because these factors are sufficient to establish reasonable suspicion and reasonable fear, we need not consider whether the occupants' failure to respond to Officer Branson’s knock is yet another factor in support of both.

. Brown further contends, and the dissent suggests, that the trunk search was unlawful because Officer Branson did not testify that he opened the trunk in search of additional contraband; rather, he testified that he did so to secure Brown's belongings. Like the test for reasonable suspicion under Terry, however, the test for probable cause is objective. See Whren, 517 U.S. at 813, 116 S.Ct. at 1774 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Thus, Branson’s "actual motives for conducting the search were not relevant as long as his actions were objectively reasonable.” Christian, 187 F.3d at 670.

. Brown also argues that Turner is inconsistent with Michigan v. Long, noting that although Long concluded that a hunting knife and marijuana were lawfully discovered in the passenger compartment of a car, it did not go on to reach the question of the legality of the subsequent trunk search but instead remanded the issue to the state court. The Court, however, made quite clear that the reason for the remand had nothing to do with the merits of the issue. See Long, 463 U.S. at 1053, 103 S.Ct. at 3483 ("[W]e decline to address this question because it was not passed upon by the Michigan Supreme Court, whose decision we review in this case.”).

.Nor is there anything to the contrary in California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), upon which the dissent relies. In Acevedo, in the course of upholding a trunk search, the Supreme Court observed in dictum that a search of the rest of the car would have been unreasonable. Id. at 580, 111 S.Ct. at 1991. As we explained in Turner, however, "[i]n Acevedo ... the police had been following a particular parcel of drugs — one the police actually had intercepted, examined, and resealed — and had watched as the suspect bag was placed in the trunk.” Turner, 119 F.3d at 22-23. By contrast, in Turner as well as in this case: " '[S]uspicion was not directed at a specific container.' ... Rather, ... the police had probable cause to search 'every part of the vehicle and its contents that may conceal the object of the search,’ ” and "[njeither logic nor case law excludes [the] trunk from the list of such locations.” Id. at 23 (quoting Ross, 456 U.S. at 825, 102 S.Ct. at 2173).

. See, e.g., United States v. Fladten, 230 F.3d 1083, 1086 (8th Cir.2000) (holding that drug paraphernalia on the backseat of a car parked near a house where drug-related activity took place provided probable cause for a trunk search); United States v. Parker, 72 F.3d 1444, 1450 (10th Cir.1995) (holding that drugs and a gun found in a passenger compartment, in combination with the odor of marijuana smoke, provided probable cause to search the trunk, although the odor alone would have been insufficient); United States v. Kelly, 961 F.2d 524, 527-28 (5th Cir.1992) (holding that a gun, drugs, and ammunition found in a passenger compartment, as well as the smell of marijuana, conferred probable cause to search the entire car, including the engine compartment); United States v. McGuire, 957 F.2d 310, 314 (7th Cir.1992) (holding that open alcohol containers in the passenger compartment justified a trunk search); United States v. Burnett, 791 F.2d 64, 67 (6th Cir.1986) (holding that a small amount of marijuana found on a car's floor provided probable cause for a trunk search); United States v. Rickus, 737 F.2d 360, 367 (3d Cir.1984) (holding that a screwdriver, pliers, and bulletproof vests found in a car’s passenger compartment justified a trunk search); United States v. Haley, 669 F.2d 201, 204 (4th Cir.1982) (holding that marijuana odor and a bag of marijuana found in a car were sufficient to support a trunk search).