HARRY\T. EDWARDS, Circuit Judge,
concurring.

The needs of law enforcement stand in constant tension with the Constitution’s protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials:

“These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. ” Brinegar v. United States, 338 U.S. 160, 180, 69 S.Ct. 1302, 93 L.Ed. 1879 (Jackson, J., dissenting).

Almeida-Sanchez v. United States, 413 U.S. 266, 273-74, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (alteration in original).
* * * * Hs
“It [is] a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magis *99 trate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.” California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (internal quotation marks omitted). The officers in this case obtained no warrant before searching the trunk of the car Tarry Jackson was driving. The Government invokes the so-called “automobile exception” established by the Court in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), which, because of the exigency arising out of an automobile’s likely disappearance, permits warrantless searches of moving vehicles. Although that exception reheves officers of the duty to obtain a warrant, it retains the requirement that there exist “probable cause to believe that the vehicle contain[s] evidence of crime.” Acevedo, 500 U.S. at 569, 111 S.Ct. 1982. Accordingly, the question before us is whether, “given all the circumstances” preceding the search, there existed “a fair probability that contraband or evidence of a crime [would] be found” in the trunk. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (reaffirming an objective “totality-of-the-circumstances analysis” in probable cause determinations).
******
The police officers in this case were faced with an unlicensed driver operating a car with a broken tag light and stolen tags. The car itself was unregistered, and a records check revealed that it had not been reported stolen. The District Court concluded that a fair probability existed that the officers might find the car’s “real tags” in the trunk. Wisely, the Government does not defend this argument before us, for, as Jackson points out, there is no reason to believe that an unregistered car would have any legitimate tags. .Br. for Appellant at 9-10. Instead, the. Government presents two arguments in support of its claim that the facts here gave rise to probable cause to search the trunk. Neither argument is persuasive.
First, the Government argues that the presence of stolen tags on the car creates a fair probability that' “additional contraband, such as one or more additional stolen tags, might well be in the trunk too.” Gov’t Br. at 14. This is a preposterous contention. The fact that a car has stolen tags affixed to it creates no good reason to believe that additional contraband will be found in the trunk. The Government’s reliance on United States v. Rocky Brown, 334 F.3d 1161 (D.C.Cir.2003), and United States v. Turner, 119 F.3d 18 (D.C.Cir.1997), is unavailing. Those cases stand only for the unremarkable proposition that finding drugs or guns in the passenger compartment of a car gives rise to probable cause to search the trunk for additional contraband. Finding stolen license plates affixed to a car, however, is fundamentally different from finding drugs or guns in the passenger compartment.
Unlike in Brown and Turner, where we noted the empirical connection between the existence of guns and drugs in a passenger compartment and additional contraband in the trunk, there is no evidence before us to suggest that a person who affixes stolen tags to a car is likely to have additional stolen tags or related contraband in the trunk. And the Government fails to provide any specific explanation why such an inference should be drawn.
The Government’s reliance on United States v. Monte Brown, 374 F.3d 1326 (D.C.Cir.2004), is similarly misplaced. In that case, we held that a fraudulent credit card and fraudulent driver’s licenses found in the pássenger compartment of a car created a fair probability that items fraudulently purchased with the documents would be found in the trunk. . Finding *100 stolen tags on a car creates no similar inference that related contraband will be located in the trunk. One is hard pressed even to imagine what contraband could be associated with stolen tags in a manner similar to the way in which fraudulent purchases are associated with fraudulent credit cards and identification.
At bottom, the Government’s position would require us to accept the view that any time contraband is found in a person’s possession, a fair probability exists that additional contraband will be found in other areas under the person’s control. In other words, the Government would have us hold that evidence indicating that a person may have committed one crime, without more, invariably gives rise to probable cause to believe that he has committed others. This position is clearly untenable under our Fourth Amendment jurisprudence.
The Government’s second contention is that the stolen tags gave the police officers reason to believe that the car was stolen, creating a fair probability that evidence related to the theft would be found in the trunk. This might be a tenable argument in some cases, because it is not entirely implausible to assume that people who steal cars may replace the stolen car’s real tags with stolen tags in order to conceal the true identity of the car. In this case, however, such an inference cannot be easily drawn, because the police officers knew that the car was unregistered and that it had not been reported stolen.
If a car is not registered, then it has no legitimate tags. The most reasonable inference to be drawn in this situation is that the owner has placed stolen tags on the car to avoid being stopped for driving without tags, while avoiding the expense attendant to registering the car and obtaining legitimate tags. In other words, if a car has no legitimate tags because it is unregistered, then police officers have no good reason to assume that the stolen tags are intended to conceal the true identity of the vehicle. Moreover, the explanation Jackson gave to the officers — that he had borrowed the car from his girlfriend who had recently purchased it at an auction — is reasonable on its face and comports with the inference that the stolen tags were affixed not to conceal that the car was stolen but instead because the car had no legitimate tags. Accordingly, considering the totality of the circumstances — including the known and undisputed facts that the car was unregistered and had not been reported stolen — the officers lacked probable cause to search the trunk for evidence that the car was stolen.
In short, before the officers conducted their search of the vehicle’s trunk, there was no fair probability that contraband or evidence of a crime would be found. Therefore, the District Court erred in holding that the police officers were engaged in objectively reasonable law enforcement activity when they searched the trunk of the car that Jackson was driving.
* * * * * *
There is always a temptation to turn a blind eye to invasions of citizens’ Fourth Amendment rights in the face of potentially inculpatory evidence. Judges are not immune from the burdens of human nature, so we are invariably tested when asked to exclude evidence that tends to prove a defendant’s guilt. “The cost to the truth-seeking process of evidentiary exclusion invariably is perceived more tangibly in discrete prosecutions than is the protection of privacy values through deterrence of future police misconduct.” James v. Illinois, 493 U.S. 307, 319, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990). But judges must resist the temptation to ignore unconstitutional conduct by police officers, because it is our sworn obligation to *101 show “jealous regard for maintaining the integrity of individual rights” and “ ‘resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights.’ ” Mapp v. Ohio, 367 U.S. 643, 647, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (quoting I Annals of Cong. 439 (1789) (remarks of James Madison)).
In applying the exclusionary rule, courts “must focus on systemic effects ... to 'ensure that individual liberty from arbitrary or oppressive police conduct does not succumb to the inexorable pressure to introduce all incriminating evidence, no matter how obtained, in each and every criminal case.” James, 493 U.S. at 319-20, 110 S.Ct. 648. “The occasional suppression of illegally obtained yet probative evidence,” distasteful though it may seem in the context of a particular case, “has long been considered a necessary cost of preserving overriding constitutional values.” Id. at 311, 110 S.Ct. 648. It is our duty to maintain the sanctity of the constitutional right to privacy free from unreasonable government intrusion.